

FILED

Jun 20 2019, 8:52 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John B. Norris
Vandivier Norris & Solomon
Franklin, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Chandra K. Hein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Reese Levi Keith,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

June 20, 2019

Court of Appeals Case No.
18A-CR-1961

Appeal from the Johnson Superior
Court

The Honorable Peter D. Nugent,
Judge

Trial Court Cause No.
41D02-1705-F2-5

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Reese Keith (Keith), appeals his convictions and sentences for burglary of a dwelling resulting in serious bodily injury, a Level 1 felony, Ind. Code §§ 35-43-2-1; 35-43-2-1(4); two Counts of robbery while armed with a deadly weapon, Level 3 felonies, I.C. § 35-42-5-1(2) (2014); two Counts of criminal confinement while armed with a deadly weapon, Level 3 felonies, I.C. §§ 35-42-3-3(a); 35-42-3-3(b)(2)(A); auto theft, a Level 6 felony, I.C. § 35-43-4-2.5(b)(1) (2014); and his adjudication as an habitual offender, I.C. 35-50-2-8(b).

We affirm in part, reverse in part, and remand with instructions.

## ISSUES

Keith presents five issues on appeal, which we restate as:

(1) Whether the State produced sufficient evidence to prove beyond a reasonable doubt that he committed burglary resulting in serious bodily injury;

(2) Whether his convictions for robbery, criminal confinement, and auto theft are barred by the continuous crime doctrine;

(3) Whether the trial court abused its discretion when it admitted evidence garnered from Keith's custodial interviews;

(4) Whether the trial court abused its discretion when it sentenced Keith; and

(5) Whether Keith's sentence is inappropriate in light of the nature of the offenses and his character.

## FACTS AND PROCEDURAL HISTORY

[4] On May 14, 2017, following an automobile accident that occurred when he was intoxicated on methamphetamine, Keith was arrested and admitted for treatment at Johnson Memorial Hospital, in Franklin, Indiana, before being escorted to jail. Keith was discharged from the hospital into police custody but was readmitted to Johnson Memorial shortly thereafter due to reported seizure activity. Keith was not in police custody when he was readmitted for treatment.

[5] Sometime after 3:20 a.m. on May 15, 2017, Keith disconnected himself from his heart monitor and IV and left the hospital without being formally discharged by his physician. Keith entered the garage of the nearby home of ninety-year-old Clayton Dixon and eighty-eight-year-old Ella Dixon (the Dixons). Keith initially slept in the Dixons' garage but later broke into the Dixons' home through a basement window so that he could steal clothing in order to change out of the hospital gown he was still wearing.

[6] Shortly after Keith broke into their basement, the Dixons left home to do errands. While they were away, Keith changed into Clayton's clothing and ate the Dixons' food. Keith also ransacked the home and discovered the Dixons'

firearm cabinet. The Dixons surprised Keith by returning from their errands quickly. Ella entered the back door of the home into the kitchen and was met by Keith, who was wearing a ski mask and pointing one of the rifles he had found in the home at her. Ella attempted to call 9-1-1 on her cell phone, but Keith grabbed the cell phone from her. Clayton then entered through the back door and attempted to subdue Keith, only ceasing his efforts upon Ella's pleas to Clayton to cooperate to avoid injury.

[7] Keith used duct tape to bind Ella's and Clayton's hands. He then ordered them into their hallway because he feared they could be seen through the home's large picture window. Keith used more duct tape to bind Clayton by his arms and legs to a chair. Keith took Clayton's wallet from him and removed the cash it contained. Keith also duct taped Ella's arms and legs to her walker. He rummaged her purse and removed cash and the keys to the Dixons' automobile. After holding the Dixons in their home for approximately forty minutes, Keith drove away in their automobile, taking three guns and cash with him. Clayton accessed his pocketknife and used it to cut himself and Ella free. Ella alerted the authorities, who discovered Keith's hospital identification bracelet and hospital gown in the garage where he had discarded them. Subsequent investigation revealed the presence of Keith's DNA on the hospital gown and on shards of glass collected from the Dixons' broken basement window. Clayton and Ella sustained substantial bruising as a result of being bound. After the offenses, Clayton complained to Ella that his bruises "were sore." (Transcript Vol. II, p. 73).

[8]     On May 16, 2017, the State filed an Information, charging Keith with multiple offenses. After a series of amendments to the Information, the final charges against Keith were for burglary to a dwelling resulting in serious bodily injury, a Level 1 felony; two Counts of robbery while armed with a deadly weapon, a Level 3 felony;[1] two Counts of criminal confinement while armed with a deadly weapon, Level 3 felonies; and auto theft, a Level 6 felony. The State also sought to have Keith adjudicated as an habitual offender.

[9]     A warrant for Keith's arrest was served on him in Richmond, Indiana, on June 20, 2017. On June 21, 2017, Detective Scott Carter (Detective Carter) of the Franklin Police Department interviewed Keith. At the beginning of the interview, Keith informed Detective Carter that he had last used methamphetamine on June 20, 2017, around 2:00 p.m. and that he was still "kind of high right now, so." (Exh. 37, p. 42).[2] Keith believed that the effect of the methamphetamine had been reactivated when he had eaten after his arrest, but he confirmed that he had been given some medication "to help" and that he had been "medically cleared." (Exh. 37, p. 42). In response to a question regarding his level of education, Keith reported that he had taken some college classes. Keith appeared to Detective Carter to be nervous but conscious, alert, and in control of his faculties. Detective Carter provided Keith with his

---

[1] The State charged both robberies as Level 3 robberies with a deadly weapon. (Appellant's App. Vol. II, pp. 53, 59). It appears that the trial court's sentencing order and the abstract of judgment mistakenly refer to Keith's conviction for Count IV as robbery resulting in bodily injury. (Appellant's App. Vol. II, pp. 24, 248).

[2] All references to exhibit page numbers are to the pagination of the Exhibit Volume PDF.

*Miranda* advisements, which Keith also read silently to himself. Keith executed the waiver form which provided that he understood his rights, did not wish an attorney, and agreed to speak without threat or coercion. During the interview, which lasted approximately one hour, Keith made incriminating statements, including admissions that he had broken into the Dixons' home and taken their car, money, and guns and that he "made them think there were bullets in the gun." (Exh. 37, p. 52). Detective Carter also interviewed Keith on May 23, 2017, for approximately forty-five minutes. After executing a written waiver of his *Miranda* rights, Keith acknowledged that, despite the fact that he was high when he provided his first statement to Detective Carter, everything that he had said was true.

[10] On October 6, 2017, and May 24, 2018, the trial court convened Keith's bench trial. Ella and the Dixons' two sons testified regarding the changes in Clayton's behavior after the offenses. Clayton had been diagnosed with Alzheimer's dementia in August 2016. His symptoms of memory loss and cognitive disfunction had been stabilized with medication, and the Dixons had enjoyed an active life together. Immediately after the offenses, Clayton became more sedentary and withdrawn. Clayton's mood then turned sullen and aggressive toward Ella. Clayton spoke to Ella using foul language and told his wife of almost seventy years that he wanted a divorce, behavior that he had never before exhibited. Clayton eventually became so confused that he telephoned the police and inaccurately reported that his son Greg had tried to rob them. The family became concerned when Clayton began cleaning his guns and

keeping a firearm close at hand in the house. Clayton was taken to a psychiatric hospital where he was treated for a month, and he was subsequently transferred to an assisted living facility because he had lost the ability to care for himself physically. Clayton was not expected to ever return home or to live independently again.

[11] In furtherance of its theory that Keith had caused serious bodily injury in the form of "permanent or protracted loss or impairment of the function of Clayton Dixon's mind" as charged in the burglary Information, the State also presented the testimony of a neurologist, Dr. Dawn Zapinski (Dr. Zapinski), who had treated Clayton before and after the offenses. (Appellant's App. Vol. II, p. 58). Dr. Zapinski saw Clayton on April 27, 2017, and had noted that his condition continued to be stabilized by his medication. Dr. Zapinski next saw Clayton in September of 2017, after the offenses. She noted that Clayton's condition had significantly worsened in that he was more confused and had lost memory since his last examination.

[12] According to Dr. Zapinski, physical or mental stress can cause cognitive decline because stress hormones cause the production of proteins that cause irreversible cell death in the brain, a part of the body which she agreed could be characterized as "an organ." (Tr. Vol. II, p. 174). It was Dr. Zapinski's opinion that, as a result of the offenses, Clayton had experienced an "acute insult to the brain" which had caused permanent loss of some of his brain function. (Tr. Vol. II, p. 183). Dr. Zapinski noted that although decline was inevitable with Alzheimer's dementia, that decline was normally more gradual

when a patient was on a medication regimen. She believed that it was the offenses that caused Clayton's decline because he had experienced a rapid, acute decline immediately after those events.

[13] On May 31, 2018, the trial court found Keith guilty as charged. After the State presented evidence that Clayton had five prior unrelated felony convictions, the trial court adjudicated Keith to be an habitual offender. On July 11, 2018, the trial court conducted Keith's sentencing hearing. The trial court found Keith's criminal history consisting of six felonies, five misdemeanors, and seven probation violations as a significant aggravating circumstance. The trial court found as additional aggravators that the Dixons were both significantly older than sixty-five, Keith was on probation when the offenses were committed, and that Keith prevented Ella from calling 9-1-1. The trial court found as a mitigating circumstance that Keith spoke to law enforcement and admitted his involvement in the offenses. The trial court found that the aggravating circumstances outweighed the mitigating circumstance and sentenced Keith as follows:

| Count I | Burglary | Level 1 | 35 years |
| Count II | Robbery | Level 3 | 12 years |
| Count III | Confinement | Level 3 | 12 years |
| Count IV | Robbery | Level 3 | 12 years |
| Count V | Confinement | Level 3 | 12 years |
| Count VI | Auto Theft | Level 3 | 2 years |

The trial court ordered Keith to serve his sentences for the burglary and the Count II robbery consecutively. The trial court ordered Keith to serve all of his other sentences concurrently, for a base sentence of forty-seven years. The trial court enhanced Keith's sentence by fifteen years for being an habitual offender, which it ordered was "consecutive" to the burglary and robbery sentences, for an aggregate sentence of sixty-two years. (Tr. Vol. II, p. 233).

[14] Keith now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

### I. *Sufficiency of the Evidence of Serious Bodily Injury*

[15] Keith contends that the State did not prove beyond a reasonable doubt that the burglary he committed resulted in serious bodily injury sufficient to elevate the offense to a Level 1 felony. It is well-established that when we review the sufficiency of the evidence to support a conviction, we consider only the probative evidence and the reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). It is not our role as an appellate court to assess witness credibility or to weigh the evidence. *Id*. We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id*.

[16] The State charged Keith with Level 1 felony burglary of a dwelling resulting in serious bodily injury. The serious bodily injury alleged by the State was the "permanent or protracted loss or impairment of the function of Clayton Dixon's mind." (Appellant's App. Vol. II, p. 64). One of Keith's challenges to the

evidence supporting his conviction for burglary is that the State did not charge him with inflicting an injury consistent with the statutory definition of serious bodily injury because it charged him with permanent or protracted loss or impairment of function "not to a body part or organ of Clayton, but to his mind." (Appellant's Br. p. 21). Resolution of this issue requires us to examine and construe the statutory definition of serious bodily injury to determine if the injury alleged by the State fits within its parameters. Whenever we construe a statute, our primary purpose is to ascertain and give effect to the intent of the legislature in enacting the statute. *Adams v. State*, 960 N.E.2d 793, 798 (Ind. 2012). We first look to the words of the statute itself, as it is the best evidence of legislative intent. *Id*. If the terms of a statute are clear and unambiguous, we must apply the plain meaning of the terms without resorting to any other rules of statutory construction. *Pierce v. State*, 29 N.E.3d 1258, 1265 (Ind. 2015).

[17] For our purposes, "serious bodily injury" is defined by statute as "bodily injury . . . that causes [] permanent or protracted loss or impairment of the function of a bodily member or organ[.]" I.C. § 35-31.5-2-292. The term "bodily injury" is further defined in relevant part as "any impairment of physical condition." I.C. § 35-31.5-2-29. Thus, a serious bodily injury must be a *bodily* injury, which is an impairment of a *physical* condition. Neither party argues that the terms employed in these statutes are ambiguous, and we do not find them to be so. Applying the plain meanings of the terms, we conclude that an injury to the mind, as alleged here by the State, does not qualify as a *bodily* injury. The State did not allege that Keith had damaged Clayton's brain but, rather, that he had

damaged Clayton's mind. The mind may be defined as "[t]he source of thought or intellect; the seat of mental faculties." Black's Law Dictionary (8th ed. 2004). Although the mind has a physical location in the brain, its functioning is primarily mental, not physical. Thus, any impairment to its functioning is not primarily the impairment of a physical condition. To hold otherwise would be to eviscerate the meaning of the term "physical condition" and would conceivably allow the State to charge a defendant with an offense resulting in serious bodily injury whenever it negatively impacted the victim's mental state.

[18] Although our research uncovered no Indiana cases bearing directly on the issue, our conclusion is buttressed by our supreme court's decision in *Bailey v. State*, 979 N.E.2d 133, 139 (Ind. 2012), in which it concluded that any amount of physical pain constitutes bodily injury. As part of its analysis, the court noted that

> [b]odily injury is defined as "physical pain, illness, or any impairment of physical condition," Model Penal Code § 210.0(2), and "includes more than the consequences of direct attack. It also covers pain, illness, or physical impairment caused indirectly . . ." Model Penal Code § 211.1 cmt. 3. *The minimum floor, as it were, is simply "the fact or prospect of physical injury."* Model Penal Code § 211.1 cmt. 2. "Mere offensive contact" and "*wrongs based solely upon insult or emotional trauma*" are excluded because they can be punished under other substantive provisions, and "[t]he principle thrust of Section 211.1 is to reach the infliction of physical injury." Model Penal Code § cmts. 2-3.

*Id*. (emphasis added, footnote omitted). We glean from the fact that the *Bailey* court cited these passages with approval that it generally considers the statutory

definitions of bodily injury, and by extension serious bodily injury, to encompass some form of physical injury and not the mental injury alleged here. *Id*.

[19] We also note that other jurisdictions intending to include mental injuries within the ambit of the definition of their equivalent of bodily injury have used specific, express terms in order to do so. *See, e.g.*, Colo. Rev. Stat. § 18-1-901(c) ("'Bodily injury' means physical pain, illness, or any impairment of physical or mental condition."); Mont. Code Ann. § 45-2-101(5) ("'Bodily injury' means physical pain, illness, or an impairment of physical condition and includes mental illness or impairment."). If the General Assembly had wished to include mental illness or injury within the statutory definition of bodily injury and serious bodily injury, it could have done so. It did not. *See Thompson v. State*, 5 N.E.3d 383, 388 (Ind. Ct. App. 2014) (noting that in construing a statute we do not read terms into the statute and that "it is just as important to recognize what the statute does not say as to recognize what it does say.").

[20] Concluding that the injury to Clayton alleged by the State did not qualify as serious bodily injury, we do not address Keith's other claims regarding the sufficiency of the evidence. In cases where we find insufficient evidence to support the element which elevates the felony level of an offense, we order the trial court to "vacate the conviction upon the improperly elevated offense and enter a judgment of conviction on the highest class of offense supported by the evidence." *See Williams v. State*, 748 N.E.2d 887, 892-93 (Ind. Ct. App. 2001) (vacating Williams' conviction for Class A felony aiding burglary where

evidence did not support a finding of bodily injury and remanding for entry of judgment as a Class B felony which was supported by the evidence). Accordingly, we will examine the record to determine the next highest level of burglary offense that was supported by the evidence.

[21] A person who breaks and enters the dwelling of another person with the intent to commit a felony or theft commits burglary, a Level 4 felony. I.C. § 35-43-2-1(1). A burglary is elevated to a Level 2 felony if it is committed while armed with a deadly weapon. I.C. § 35-43-2-1(3)(A). However, that portion of the statute does not contemplate a situation such as presented here, where the burglar enters unarmed and thereafter becomes armed. *State v. McHenry*, 74 N.E.3d 577, 579 (Ind. Ct. App. 2017), *trans. denied*. A burglary is elevated to a Level 3 felony if it results in bodily injury to someone other than the defendant. I.C. § 35-43-2-1(2). As noted above, evidence of any degree of pain experienced by the victim will sustain a finding of bodily injury. *Bailey*, 979 N.E.2d at 135. Ella testified that after the offenses, Clayton complained of pain as a result of the bruising he sustained when Keith duct taped him to a chair. We conclude that this evidence supports a conviction for Level 3 felony burglary. Therefore, we vacate Keith's conviction for Level 1 burglary and remand for entry of judgment and resentencing on the conviction as a Level 3 burglary.

## II. *Continuous Crime Doctrine*

[22] Keith next contends that his convictions must be vacated because they are barred by the continuous crime doctrine. This doctrine is a species of common law double jeopardy, the application of which is limited to situations where a

defendant has been charged multiple times with the same continuous offense. *Hines v. State*, 30 N.E.3d 1216, 1219 (Ind. 2015). "The continuous crime doctrine does not seek to reconcile the double jeopardy implications of two distinct chargeable crimes; rather, it defines those instances where a defendant's conduct amounts only to a single chargeable crime." *Id.* Whether multiple convictions are precluded based on the continuous crime doctrine is a question of law which we review *de novo. Id.*

[23] Keith bases his argument on this court's decision in *Buchanan v. State*, 913 N.E.2d 712 (Ind. Ct. App. 2009), *trans. denied*, in which we held, in light of the State's acknowledgement on appeal that it had conceded the issue at sentencing, that Buchanan's convictions for false reporting and intimidation were so compressed in time, place, singleness of purpose, and continuity of action that they constituted but one single transaction, leading us to vacate those convictions. *Id.* at 720-21. The sum total of Keith's argument on this issue is that his convictions for two Counts of robbery, two Counts of criminal confinement, and auto theft fall within the scope of the burglary "because the crimes were so compressed in terms of time, place, singleness of purpose, and continuity of action to constitute a single transaction." (Appellant's Br. p. 24). Keith does not apply *Buchanan* or any other legal authority to the facts of his case to explain why the doctrine should apply. We remind Keith that it is an appellant's burden to develop his argument on the issues he presents and to support his argument with cogent reasoning, legal authority, and citations to the record on appeal. *See* Ind. Appellate Rule 46(A)(8)(a). Any application of

the continuous crime doctrine is necessarily fact-sensitive. Given Keith's utter failure to apply the facts of his particular case to the legal authority he has cited, we conclude that he has waived this claim. *See Griffith v. State*, 59 N.E.3d 947, 958 n.5 (Ind. 2016) (holding that Griffith waived a claim where he failed to develop it with cogent reasoning).

[24] However, even if he had not waived his continuous crime doctrine argument, it is not well-taken. In *Hines*, our supreme court expressly disapproved of *Buchanan*, holding that "[t]o the extent that *Buchanan* stands for the proposition that the continuous crime doctrine may be judicially extended to two distinct offenses, we disagree." *Hines*, 30 N.E.3d at 1220. Therefore, the only sets of offenses to which the doctrine could potentially apply were Keith's two robbery and two criminal confinement convictions, as they are multiple charges of the same offense. However, the doctrine does not apply to those sets of convictions either because different victims were involved. *See Frazier v. State*, 988 N.E.2d 1257, 1264 (Ind. Ct. App. 2013) (concluding that no double jeopardy violation existed under either the continuous crime doctrine or the actual evidence test where offenses charged involved different victims). Thus, in addition to his waiver of the issue, the continuous crime doctrine does not bar Keith's convictions.

### III. *Voluntariness of Keith's Statements*

[25] Keith also contends that the trial court abused its discretion when it admitted into evidence his May 21, 2017, and May 23, 2017, statements to Detective Carter. Keith argues that he was intoxicated on methamphetamine on May 21,

2017, which rendered his statement involuntary and that his subsequent statement, made when he was no longer intoxicated, was fruit of the poisonous tree. Decisions to admit or to exclude evidence are within the sound discretion of the trial court. *Wright v. State*, 108 N.E.3d 307, 313 (Ind. 2018). Accordingly, we afford those decisions deference and will reverse only upon an abuse of the trial court's discretion resulting in error and affects the defendant's substantial rights. *Id*. However, issues implicating constitutional questions, such as the voluntariness of a confession, are reviewed *de novo*. *Guilmette v. State*, 14 N.E.3d 38, 40 (Ind. 2014).

[26] Keith argues that under "Indiana law" his statements were involuntary. (Appellant's Br. p. 25). Article I, Section 14, of our state constitution provides that "[n]o person, in any criminal prosecution, shall be compelled to testify against himself." Part of this constitutional protection is that, in order for a defendant's statement to be admissible at trial against him, it must have been given voluntarily. Under state law, when a defendant challenges the voluntariness of his confession, the State must prove beyond a reasonable doubt that the confession was given voluntarily. *Jackson v. State*, 735 N.E.2d 1146, 1153 n.4 (Ind. 2000). The voluntariness of a defendant's statement is determined by examining the totality of the circumstances, including any violence, threats, promises or other improper influences brought to bear to bring about the statement. *Luckhart v. State*, 736 N.E.2d 227, 229 (Ind. 2000). Upon review of a challenge to a trial court's admission of a confession, we do not

reweigh the evidence, and we examine the record for substantial, probative evidence of voluntariness. *Ringo v. State*, 736 N.E.2d 1209, 1211 (Ind. 2000).

[27] Keith notes that he argued at trial that his statements to Detective Carter were involuntary because he was "subjected to a 'confined environment, a coercive environment, questioned for an hour on one occasion, and . . . forty-five minutes or so on another occasion.'" (Appellant's Br. p. 25). However, Keith develops no further argument that the environment or duration of his statement rendered it involuntary. The gravamen of Keith's argument regarding the voluntariness of his statement is that he was intoxicated on methamphetamine when he gave his first statement to Detective Carter. However, a confession made while voluntarily intoxicated may still be given knowingly and voluntarily. *Ellis v. State*, 707 N.E.2d 797, 802 (Ind. 1999). A confession will only be deemed involuntary when a defendant is so intoxicated as to be not conscious of what he is doing or when it produces a state of mania. *Id*. Any lesser degree of intoxication goes merely to the weight to be given to the confession, not to its admissibility. *Wilkes v. State*, 917 N.E.2d 675, 680 (Ind. 2009), *reh'g denied*.

[28] Our independent examination of the video recording of Keith's May 21, 2017, statement leads us to conclude that his voluntary intoxication on methamphetamine did not render his statement involuntary. Keith informed Detective Carter at the beginning of the interview that he had last ingested methamphetamine around 2:00 p.m. the day before and that he thought that he was still intoxicated. Although at times Keith spoke rather quickly, moved

compulsively, and became emotional, we observe that he read and signed a waiver of his rights, understood why Detective Carter wished to speak to him, spoke coherently to Detective Carter, and logically answered questions in detail. Keith exhibited understanding of his situation when he conversed with Detective Carter about the evidence that he had left at the scene and what level of felonies he might be charged with. Keith also initiated a conversation about cooperating with law enforcement, presumably as a confidential informant, in order to improve his prospects. Despite his intoxication, these circumstances lead us to conclude that Keith's statement was voluntary. *See Luckhart*, 736 N.E.2d at 231 (statement voluntary where Luckhart confessed while intoxicated on crack cocaine but was oriented as to time and place, answered questions in a logical sequence, carried on a lucid conversation, and appeared to be in control of her faculties).

[29] Keith also exhibited control over his physical person, as he walked into the interview room and stayed seated in his chair without assistance, signed the waiver form, and consumed a soda without difficulty. *See id.* (considering the fact that Luckhart was able to walk of her own volition as evidence of voluntariness); *see also Owens v. State*, 754 N.E.2d 927, 930 (Ind. 2001) (considering evidence of Owens' physical coordination in sipping a soda while giving his statement and his ability to initial his written statement as evidence of voluntariness despite intoxication). We conclude that, under the totality of these circumstances, Keith was not so intoxicated on methamphetamine that he

was unaware of what he was doing, nor was he in a state of mania, when he gave his statement. *See Luckhart*, 736 N.E.2d at 231.

[30] Keith does not argue that he was unaware of what he was doing or in a manic state when he spoke with Detective Carter on May 21, 2017. Rather, he points to evidence in the record that he had been intoxicated on methamphetamine prior to the offenses, which we find has little bearing on his mental and physical state one week later when he gave his statement. Keith also argues that Detective Carter acknowledged that Keith exhibited some indicia of methamphetamine intoxication and that Detective Carter "should have had Keith examined to determine the level and the kinds of intoxicants causing Keith's impairment before continuing his questioning of Keith." (Appellant's Br. p. 26). However, Keith provides no legal authority for his apparent proposition that a specialized medical examination to measure and assess his intoxication was constitutionally necessary to render his statement voluntary, and we note that Keith had been examined before making his statement, had been medically cleared, and had been given medication "to help." (Exh. 37, p. 42). Because Keith was not so intoxicated on methamphetamine at the time he provided his initial statement so as to render it involuntary, the trial court did not abuse its discretion when it admitted either his May 21, 2017, or his May 23, 2017, statements into evidence. *Wright*, 108 N.E.3d at 313.

## IV. *Sentencing*

[31] Because we have determined that Keith's Level 1 felony burglary conviction must be vacated and re-entered as a Level 3 felony, we remand for resentencing.

However, we will address Keith's argument that the trial court abused its discretion when it sentenced him, as some of the same issues may reoccur upon resentencing. The trial court found as the sole mitigator in this case that Keith had cooperated with law enforcement by speaking with them after his arrest. Keith argues that the trial court abused its discretion because it did not consider as mitigating circumstances his remorse, his family support network, and the Indiana Risk Assessment System Community Corrections Tool assessment, included in his presentence investigation report, which placed him at a high risk to re-offend.

[32] As a general matter, so long as a sentence imposed by a trial court is within the statutory range for the offense, it is subject to review only for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). An abuse of the trial court's sentencing discretion occurs if its decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* A trial court abuses its discretion when it fails to enter a sentencing statement at all, its stated reasons for imposing sentence are not supported by the record, its sentencing statement omits reasons that are clearly supported by the record and advanced for consideration, or its reasons for imposing sentence are improper as a matter of law. *Id.* at 490-91.

[33] As to his remorse, Keith simply states that the trial court did not find it as a mitigator, despite his expressions of remorse during his two custodial interviews. It was Keith's burden on appeal to establish that the trial court

overlooked mitigating evidence that was both clearly supported by the record and significant. *Green v. State*, 65 N.E.3d 620, 636 (Ind. Ct. App. 2016), *trans. denied*. Even if we were to determine that his remorse was supported by the record, Keith has made no effort to convince us that his remorse was significant for sentencing purposes and has failed to meet his burden of persuasion. Indeed, while he expressed his concern for the Dixons and his remorse about what he had done several times during his two custodial interviews, the trial court was not obligated to accept his expressions of remorse as mitigating. *Phelps v. State*, 969 N.E.2d 1009, 1020 (Ind. Ct. App. 2012), *trans denied*. It is equally true that the trial court was not obligated to explain on the record why it failed to credit Keith's remorse with mitigating weight. *See Anglemyer*, 868 N.E.2d at 493. Accordingly, we find no abuse of discretion on the part of the trial court. Keith's contention that the trial court failed to find his family support as mitigating suffers the same fate, as he develops no argument on appeal regarding why that factor is supported by the record or is significant in his case. *Green*, 65 N.E.3d at 636.

[34] Regarding Keith's argument that the trial court failed to consider his risk assessment as a mitigator, we agree with the State that this factor was not advanced at sentencing. It is well-settled that it is not an abuse of the trial court's discretion to fail to consider a mitigating circumstance that a defendant did not raise at sentencing. *Anglemyer*, 868 N.E.2d at 492. Because this factor was not advanced by Keith at sentencing and is raised for the first time on

appeal, we find no abuse of the trial court's discretion in failing to recognize it as a mitigator. *Id.*

[35] We address an additional sentencing issue *sua sponte*. The trial court imposed the fifteen-year habitual offender enhancement consecutively to the sentences for the burglary and Count II robbery convictions, rather than specifically attaching the enhancement to one of those two felonies. The habitual offender statute provides in relevant part as follows:

> The court shall attach the habitual offender enhancement to the felony conviction with the highest sentence imposed and specify which felony count is being enhanced. If the felony enhanced by the habitual offender determination is set aside or vacated, the court shall resentence the person and apply the habitual offender enhancement to the felony conviction with the next highest sentence in the underlying cause, if any.

I.C. § 35-50-2-8(j). As part of its resentencing order, the trial court must attach the habitual offender enhancement to one of Keith's felony convictions.[3]

# CONCLUSION

[36] Based on the foregoing, we conclude that the evidence did not support the trial court's finding that Keith inflicted serious bodily injury upon Clayton as charged in the Information. We remand for entry of the burglary conviction as

---

[3] Because we remand for resentencing, we do not address Keith's argument that his sentence was inappropriate in light of the nature of his offenses and his character.

a Level 3 felony and for resentencing. We also conclude that Keith's convictions are not barred by the continuous crime doctrine, Keith's statements to law enforcement were voluntary and, thus, were properly admitted, and the trial court did not abuse its discretion when it failed to find additional mitigating circumstances. However, we conclude that the trial court must attach the habitual offender enhancement to one of Keith's felony convictions upon resentencing and that the trial court must correct the abstract of judgment to reflect that Count IV was a conviction for robbery with a deadly weapon.

[37] Affirmed in part, reversed in part, and remanded with instructions.

[38] Bailey, J. and Pyle, J. concur